THE STATE v. PARTLOW, *Appellant*.

1. **Practice :** INSTRUCTION. It is not error to refuse an instruction when the principle embraced in it had already been correctly stated in instructions given.

2. **Criminal Law :** RIGHT OF SELF-DEFENCE BY ASSAILANT : MURDER. In cases where an assailant brings on the quarrel, the main feature is the intent with which he brings it on, and if it is with no felonious intent, no harboring of malice, no premeditated purpose of doing great bodily harm or killing the person assaulted, or with whom the quarrel is begun, the assailant is not a murderer, let the result of the difficulty turn out as it will.

3. ———— : MURDER : PERFECT AND IMPERFECT SELF-DEFENCE. If the slayer provoked the combat or produced the occasion, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he had no felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defence will be manslaughter only, the distinction being between the right of perfect and the right of imperfect self-defence.

4. ———— : DEFENDANT TESTIFYING : INSTRUCTION : INTENT. A defendant has a right to have an instruction based on his own testimony, and to testify as to his intent.

5. ———— : SELF-DEFENCE : RIGHT OF ASSAILANT TO WITHDRAW FROM

The State v. Partlow.

COMBAT.   Although one may be in the wrong in the first instance, by bringing on a difficulty, yet a space for repentance is always open, and where he, in good ffaith, withdraws, as far as he can, from the combat, really intending to abandon the conflict, and his adversary still pursues him, then if taking life becomes necessary to save his own, he will be justified.

6. ———— : RETREATING TO WALL.  In withdrawing from a combat, one is not required to retreat further when it cannot be done without probable death, and when the only apparent means of escape is to turn and attack the pursuer.  And retreat need not be attempted when the attack is so fierce that the assailed, by retreating, will apparently expose himself to death.

7. ———— : RIGHT OF OWNER TO EJECT ONE FROM HIS HOUSE.  If a man enter another's dwelling house peaceably, on an implied license, he cannot be ejected except on request to leave, followed by no more than the necessary and proper force, even though misbehaving himself therein.

8. ———— : THREATS.  Threats of defendant against a third person who was to be married at the house of deceased on the day of the homicide, and threats and expressions of intention by defendant to go to the house of deceased on that day, are admissible against him, as tending to disclose the *animus* of defendant in going there upon that day.

9. ———— : EVIDENCE : DYING DECLARATIONS.  Statements made by deceased to a third person, after he had been informed by another that his wound was necessarily fatal, are not admissible as dying declarations, where it was not shown as preliminary to their introduction that they were made under a sense of impending death and with the impression on the mind of the declarant of almost immediate dissolution.

*Appeal from Buchanan Criminal Court.*—HON. SILAS WOODSON, Judge.

REVERSED.

*T. W. Harl* and *D. D. Burnes* for appellant.

(1)  The declarations of a deceased person, made *in articulo mortis*, are competent and admissible.  *State v. McMillen*, 13 Mo. 30 ; 1 Greenleaf on Evidence, sec. 158.

VOL. 90—39

·(2)   Admission in evidence of threats made by a defend-
ant against the life of a person a legal stranger to de-
ceased is error.   (3)  Absence from the court room by
the judge during the argument of the state's attorney in
a capital case is error.   (4)  To prevent a defendant
from availing himself of the plea of self-defence because
he voluntarily entered into a difficulty, it must be shown
that the defendant had the felonious intent at the time
he entered into such difficulty.   State v. Culler, 82 Mo.
623.   (5)  A defendant, even after voluntarily entering
into a difficulty, may acquit himself of all blame on the
ground of self-defence if, after the commencement of
such difficulty, he endeavors in good faith to withdraw
therefrom.   (6)  At no stage of a criminal trial can the
burden of proof shift from the state to the defendant.

*B. G. Boone*, Attorney General, for the state.

(1)   Dying declarations are only admissible when
made *in extremis*, or when part of the *res gestœ*.   1
Greenleaf's Evid. secs. 156, 162; Whar. Cr. Evid. [8 Ed.]
sec. 276 *et seq.*;. McLean v. State, 8 Mo. 153; State
v. McMillen, 13 Mo. 30; Brownell v. Railroad, 47
Mo. 239 and cases cited; State v. Sloan, 47 Mo. 604;
State v. Simon, 50 Mo. 370; State v. McCannon,
51 Mo. 160; State v. Draper, 65 Mo. 335; State v. Kil-
gore, 70 Mo. 546; State v. Curtis, 70 Mo. 597; State v.
Johnson, 76 Mo. 121; State v. Jefferson, 77 Mo. 136;
State v. Vansant, 80 Mo. 67; State v. Chambers, 87 Mo.
406; State v. Rider, ante, p. 54.   The evidence offered by
the defence as to statements made by Taylor, the de-
ceased, after he was shot, were not shown to have been
made after deceased knew or realized that he could not
recover, and were properly excluded, nor were they a
part of the *res gestœ*.   (2)   Evidence of threats made by
defendant against others than the deceased are admis-
sible to throw light on the conduct of defendant, and

show his *animus* at the time he went to Taylor's house where the homicide occurred, and where the parties threatened were. *State v. Guy*, 69 Mo. 430; *State v. Ramsey*, 82 Mo. 133; *State v. McNally*, 87 Mo. 650, and cases cited and commented on. The nearness or remoteness of such threats does not affect their competency. *State v. Adams*, 76 Mo. 355; *State v. McNally, supra.* (3) Errors which do not tend to the prejudice of the substantial rights of the defendant will not justify a reversal. *State v. Holme*, 54 Mo. 160; *State v. Grate*, 68 Mo. 22. A temporary absence from the court room by the judge, during the argument of the prosecuting attorney, is not reversible error, unless it is shown that defendant was prejudiced by reason of such absence. Appellate courts will not review unsupported charges of misconduct on the part of officers of trial courts. *Lloyd v. Railroad*, 53 Mo. 509; *State v. Morgan*, 1 Mo. App. 22; *State ex rel. v. Claudius*, 1 Mo. App. 562; *Cobb v. State*, 27 Ga. 648. (4) One who voluntarily enters into a difficulty and kills another with a deadly weapon, cannot invoke the doctrine of self-defence no matter how great his peril may have been during the affray. *State v. Underwood*, 57 Mo. 40; *State v. Lane*, 64 Mo. 319; *State v. Talbott*, 73 Mo. 350; *State v. Thomas*, 78 Mo. 337; *State v. Gee*, 85 Mo. 648. There is nothing in the evidence to show that defendant sought to withdraw from the difficulty until he had shot deceased. (5) It has been repeatedly held by this court that the law presumes murder in the second degree from the simple act of killing. *State v. Gassert*, 65 Mo. 352, and cases cited and discussed. (6) The fifth instruction given by the court at the instance of the state, is a correct declaration of law, has been repeatedly sanctioned, and does not shift the burden of proof on defendant. *State v. Dickson*, 78 Mo. 440; *State v. Wisdom*, 84 Mo. 188. (7) The instructions given clearly and fully declare the law applicable to the case under the evidence.

SHERWOOD, J.—The defendant was indicted for the murder of William J. Taylor, by shooting him with a pistol, and being brought to trial, was convicted of the second degree of that crime, and sentenced to imprisonment in the penitentiary for ten years. As is usual in such cases, there was a great deal of conflict in the testimony, the state making out a case which indicated that a felonious purpose actuated the defendant in visiting the house of Taylor on the day of the homicide, while the testimony on behalf of the defendant, and, it would seem, the weight of the testimony in the case, favored the theory that he went to Taylor's house with no other end in view but that of escorting his wife home, who was then at Taylor's, attending the wedding ceremony between Willis Bunch and Mary Reno. Against the life of Bunch it appears that threats had been made by defendant some two years before, and at frequent intervals since, almost down to the time of the homicide, which occurred the twenty-fifth day of December, 1884, and within about ten days prior to that time.

I.    The instructions of the court in regard to murder in the first and second degrees, were in usual form; and the jury were in effect instructed that, under the evidence and law of the case, unless they could find the defendant guilty of murder in the first or in the second degree, to acquit him altogether. The eleventh instruction, given at the instance of the state, was as follows: "Before the right of self-defence can avail the defendant in this case the jury must believe from the evidence, not only that the defendant had, at the time he shot the deceased, reasonable cause to apprehend a design on the part of the deceased, or others acting in concert with him, if they find others were so acting, to do him some great bodily injury, and that he had reasonable cause to apprehend immediate danger of such design being accomplished, and that he shot deceased to avert such appre-

hended danger, but they must also believe from the evidence that the defendant neither sought, invited, provoked nor commenced, by any wilful act of his own, said difficulty. And if the jury believe from the evidence that there was an affray or difficulty between defendant and deceased, and that defendant voluntarily sought or invited the difficulty, or provoked or commenced it, or brought it on by any wilful act of his own, or that he voluntarily and of his own free will engaged in it, then and in that case the jury is not authorized to acquit him upon the ground of self-defence, and this is true no matter how violent his passion became, or how hard he was pressed, or how imminent his peril may have become during said difficulty."

The phraseology of this instruction as to the defendant seeking or bringing on the difficulty, is also used in instruction numbered two, given by the court of its own motion, and also in instruction numbered seven, given at the instance of the state. The defendant saved exceptions to the refusal of three instructions asked by him as follows:

"1. The court declares the law to be, that homicide is justifiable whenever there is reasonable cause to apprehend immediate danger of any felonious maiming, wounding or disfiguring being committed upon the person committing such homicide, when the same is done to prevent the execution of such felonious maiming, wounding or disfiguring, provided at the time the deceased or those aiding, abetting and assisting him, made or were about to make such demonstrations as would induce a reasonable man to believe such danger was imminent.

"2. The court instructs the jury that even if defendant did voluntarily enter into a difficulty with deceased, still, if the jury believe from the evidence that, after said difficulty had commenced, the defendant attempted in good faith to withdraw from the difficulty, but was prevented from so doing by the deceased, then

in that event, defendant would be excused in taking the life of said Taylor, if it became necessary to do so in order to save his own.

" 3.   Before the jury can refuse to allow the defendant the benefit of the plea of self-defence, on the ground that he sought or voluntarily entered into a fight with deceased, they must believe from the evidence that defendant, at the time he so sought, or voluntarily entered into a fight with deceased, was actuated by a felonious intent to maim, wound, hurt or kill said deceased."

As to the first of the instructions just mentioned, no error occurred in its refusal, because, aside from any other consideration, the principle embraced in it had already been fully and more properly stated in instructions numbered one, six and seven, given by the court of its own motion.

I cannot speak so favorably of the refusal of defendant's third instruction, and there are many reasons for this assertion :  Although evidence on behalf of the state disclosed the existence of certain matters which, if believed by the jury to be true, would perhaps have warranted the jury in finding the defendant guilty of the highest grade of homicide, yet that on behalf of the defendant disclosed such matters as would well have warranted the jury in acquitting the defendant altogether, or in finding him only guilty of manslaughter. In *State v. Hays*, 23 Mo. 287, the evidence disclosed a state of facts well covered by the third and sixth instructions there given at the instance of the state :  " If the defendant, with a spade in his hand, took a position near Brown and gradually approached him and pushed him, for the purpose of inducing an altercation and getting a chance to kill him, and commenced raising his spade at the same time Brown commenced drawing his pistol, and then struck him and killed him, he is guilty of murder in the first degree ; and in such case it would be no defence even if the evidence showed that Brown

drew his pistol before the defendant commenced raising his spade ; for the law will not permit a man thus to induce a provocation, and so take advantage of it." " Although the jury may believe from the evidence that Brown was attempting to draw his pistol, or had it drawn at the time Hays struck, and that Hays' life or person was in imminent danger, yet, if they further believe that Hays intentionally brought on the difficulty for the purpose of killing Brown, he is still guilty of murder in the first degree." That case is a clear enunciation of the law as applicable to the state of facts disclosed by that record, a record abounding in all the incidents of murder in the first degree, prior expressions of ill-will, and murderous threats, followed up on the fatal occasion by Hays " *inching up towards* " his victim with a spade in his hands, with which he carried out his deadly purpose.

The principle thus announced in that case was followed in that of *State v. Starr*, 38 Mo. 270 ; for there a qualifying instruction, given by the court of its own motion, was expressly approved, which told the jury that : " The foregoing instructions are given with this qualification, that the right of self-defence which justifies homicide does not imply the right of attack ; and the plea of justification in self-defence cannot avail in any case where it appears that the difficulty was sought for and induced by the act of the party in order to afford him a pretence for wreaking his malice," Wagner, J., remarking : " The qualification was necessary in view of the evidence in the case. The testimony tended to show that the accused sought the altercation, and was instrumental in bringing it on ; and if the jury found such to be the fact, the law would not permit him to shield himself behind the doctrine of self-defence. Besides, the qualification is couched in the very language of Wharton, and commends itself for its justice, and is well supported by authority. Whart. on Hom. 197."

The author just cited with approval, when speaking of a case "where the attack is sought by the party killing," uses this language : "The plea of provocation will not avail in any case where. it appears that the provocation was sought for and induced by the act of the party in order to afford him a pretence for wreaking his malice; and it will presently be seen that even where there may have been previous struggling or blows, such plea cannot be admitted where there is evidence of express malice, and it must appear, therefore, that when he did the fact, he acted upon such provocation, and not upon any old grudge." Whart. on Hom. 197. And the same learned author uses similar language in another work. 1 Whart. Crim. Law [8 Ed.] secs. 474, 476.

Treating of this subject of seeking quarrel, an eminent text writer says : "If a man determines to kill another, or to do him great bodily harm, and seeks occasion for a quarrel, he cannot avail himself of the passion excited in the quarrel, because he acts from an impulse which his mind receives in its cool moments." 2 Bishop Crim. Law, sec. 715. Elsewhere the same writer says : "If, without provocation, a man draws his sword upon another, who draws in defence ; whereupon they fight, and the first slays his adversary, his crime is murder. (For he who seeks and brings on a quarrel cannot, in general, avail himself of his own wrong in defence). But where an assault, which is neither intended nor calculated to kill, is returned by violence beyond what is proportionate to the aggression, the character of the combat is changed, and if, without time for his passion to cool, the assailant kills the other, he commits only manslaughter." *Ib.* sec. 702.

. It would seem needless to say that this view of the law is supported by the most abundant authority. *State v. Lane*, 4 Ired. 113 ; *Reg. v. Smith*, 8 Car. & P. 160 ; *Slaughter's case*, 11 Leigh. (Va.) 681 ; *Murphy v. State*, 37 Ala. 142 ; *Adams v. People*, 47 Ill. 376 ; *State v. Hild-*

*rette*, 9 Ired. 429 ; *State v. Hogue*, 6 Jones Law (N. C.) 381 ; *State v. Martin*, 2 Ired. 101 ; *Atkins v. State*, 16 Ark. 568 ; *Cotton v. State*, 31 Miss. 504 ; *Stewart v. State*, 1 Ohio St. 66 ; *State v. Hill*, 4 Dev. & Bat. 491. In all of these cases I have cited, and I might have cited " a great cloud of witnesses" to bear testimony to this well established legal principle, the idea is made prominent that the main feature in such cases is the *intent with which the accused brought on the quarrel or difficulty ;* if with no felonious intent, no harboring of malice, no premeditated purpose of doing great bodily harm, or killing the person assaulted or with whom the quarrel is begun, then the accused is not a *murderer*, let the result of the difficulty turn out as it will. This view I will further illustrate by quotations from some of the cases cited, *supra*.

Thus, in *Stewart v. State, supra*, Thurman, J., said : " And again, the combat must not have been of his own seeking, and he must not have put himself in the way of being assaulted, in order that when assaulted and hard pressed, he might take the life of his assailant. \* \* \* Now it does seem to us clear that Stewart sought to bring on the affray, that he desired and intended, if assaulted, to make good his previous threats of using his knife. True, he had a right to dun Doty for his money, but he had no right to do so for the purpose of bringing on an affray in order to afford him a pretext to stab his enemy."

In *Adams v. People, supra*, Breese, J., said : " The twelfth instruction for the people was right. It was as follows : ' If the defendant sought a difficulty with the deceased for the purpose of killing him, and in the fight did kill him, in pursuance of his malicious intention of taking the life of Bostic, they will find him guilty of murder, but if they find that defendant voluntarily got into the difficulty or fight with Bostic, but did not intend to kill him at the time, and did not decline further fight-

ing before the mortal blow was struck by him, and then drew his knife and with it struck and killed Bostic, they will find the defendant guilty of manslaughter, although the cutting and killing were done in order to prevent an assault upon him by Bostic, or to prevent Bostic from getting an advantage in the fight.'"

In *Cotton v. State*, *supra*, Fisher, J., said: "The qualification by the court, made to the third instruction, is clearly erroneous. The instruction is, in substance, that if Cotton killed Smith, not in pursuance of a premeditated design, but on a sudden quarrel, the crime of murder is not made out. The modification made is, 'unless Cotton sought the quarrel, and used a deadly weapon.' The question was, whether malice prompted the accused to kill. He interposes, as his defence, by the instruction, '*no design to kill*, and that the killing was on a sudden quarrel.' The court say to him that this is no defence, not even to mitigate the crime, if you sought the quarrel and used a deadly weapon. Now, he may have done both without being guilty of murder; for he may, by seeking the quarrel, have intended only the slightest personal injury to the deceased, and he may, from sudden provocation, have used his weapon, or he may have been forced to do so in self-defence, although he was the aggressor in the quarrel. The modification amounts to this, that although there must be a formed design to take life, to constitute murder, yet such design is not necessary where the party killing seeks the quarrel and uses a deadly weapon. There must be proof of malice, in some form; the seeking of the quarrel and using the deadly weapon, may be evidence for this purpose. But this is what the defendant below was endeavoring to meet by showing no design to take life, because the killing occurred on a sudden quarrel. The modification virtually declares this to be no defence, if the party sought the quarrel."

In *State v. Lane*, *supra*, Ruffin, C. J., said: "If the

prisoner sought the deceased and entered into that fight with the purpose, under the pretence of fighting, to stab him, it was clearly murder; no matter what provocation was apparently then given or how high the prisoner's passion rose during the combat, for the malice is express and was promptly wreaked, and puts the idea of provocation out of the case."

In *State v. Hill, supra*, the defendant was convicted of murder in the first degree. He had "brought on the difficulty" by striking the deceased a blow with his fist, when the deceased stabbed him, and he thereupon stabbed and killed the deceased, but in circumstances which rendered it doubtful whether the act of the prisoner was the result of passion in consequence of being stabbed, or was necessary in self-defence, and Gaston, J., in delivering the opinion of the court, awarding a new trial, said: "It was necessary that the jury should, in the first place, ascertain whether the prisoner commenced the affray with a preconceived purpose to kill the deceased, or to do him great bodily harm. For if he did, then there was nothing in the subsequent occurrences of the transaction which could free him from the guilt of murder. If the first assault was made with this purpose, the malice of that assault, notwithstanding the violence with which it was returned by the deceased, communicates its character to the last act of the prisoner. * * * If, upon consideration of all the evidence, the jury came to the conclusion that the first assault of the prisoner was not of malice prepense, then the subsequent occurrences demanded their careful consideration, because upon these the prisoner's guilt might be extenuated into manslaughter, or excused as a homicide in self-defence." Wharton has given the ruling in this case his approval. Whart. on Hom. [2 Ed.] secs. 461, 462.

In a case which arose in Tennessee, Deaderick, C. J., observed: "The charge in this case holds, in effect, that a person who may, by improper conduct, provoke an

assault, cannot be allowed to rely on the plea of self-de-
fence, nor can he rely upon such defence if he willingly
engage in a fight, even if first assaulted and stricken.
\* \* \* Provoking words and gestures might be used
from heat of blood, in a sudden quarrel, and a fight
might, under such circumstances be engaged in, during
which a party might·have the right to defend himself
from impending danger of death or great bodily harm.''
*Daniel v. State*, 10 Lea, 261.

Horrigan & Thompson in their Cases on Self-defence,
p. 227, in a note to *Stoffer v. State*, 15 Ohio St. 47, have
given an admirable summary of the authorities on this
subject as follows : '' 1. If he (the slayer) provoked the
combat or produced the occasion, in order to have a pre-
text for killing his adversary, or doing him great bodily
harm, the killing will be murder, no matter to what
extremity he may have been reduced in the combat.
2. But, if he provoked the combat, or produced the occa-
sion without any felonious intent, intending, for in-
stance, an ordinary battery merely, the final killing in
self-defence will be manslaughter only.''

This distinction between the right of perfect and the
right of imperfect self-defence, is fully recognized in the
formula above set forth, and that formula is fully en-
dorsed by the Texas court of appeals in *Reed v. State*, 11
Tex. App. 509. · That court, when treating of this sub-
ject of self-defence, said : ''It may be divided into two
general classes, to-wit, *perfect* and *imperfect* right of
self-defence. A perfect right of self-defence can only
obtain and avail where the party pleading it acted from
necessity, and was wholly free from wrong or blame in
occasioning or producing the necessity which required
his action. If, however, he was in the wrong—if he was
himself violating or in the act of violating the law—and
on account of his own wrong was placed in a situation
wherein it became necessary for him to defend himself
against an attack made upon himself, which was superin-

duced or created by his own wrong, then the law justly limits his right of self-defence, and regulates it according to the magnitude of his own wrong.   Such a state of case may be said to illustrate and determine what in law would be denominated the imperfect right of self-defence. Whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he should take life or do serious bodily harm, then, indeed, the law wisely imputes to him his own wrong and its consequences to the extent that they may and should be considered in determining the grade of offence which, but for such acts, would never have been occasioned.   *   *   *  ' How far and to what extent he will be excused or excusable in law must depend on the nature and character of the act he was committing, and which produced the necessity that he should defend himself.   When his original act was in violation of law, then the law takes that fact into consideration in limiting his right of defence and resistance, whilst in the perpetration of such unlawful act.  If he was engaged in the commission of a felony, and to prevent its commission, the party, seeing it or about to be injured thereby, makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slay his assailant, the law would impute the original wrong to the homicide and make it murder. But if the original wrong was or would have been a misdemeanor, then the homicide growing out of or occasioned by it, though in self-defence, from any assault made upon him, would be manslaughter under the law.''

The foregoing remarks are quoted with approval in *King v. State*, 13 Tex. App. 277, where the court remarks : '' We think this view of the law is in harmony with our code, and with the decisions construing it.   It is not in conflict with the well settled doctrine that he who seeks and brings on a difficulty cannot avail himself

of the right of self-defence, in order to shield himself from the consequences of killing his adversary. In fact, it is the same doctrine, and is recognized and maintained by the best authority." This doctrine of perfect and imperfect self-defence is fully recognized by 2 Bishop's Crim. Law, section 702, *supra*, and elsewhere in his work ; also in *Cotton v. State*, and *Adams v. The People*, *supra*.

Indeed, the assertion of the doctrine that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose, is guilty of murder, and cannot avail himself of the doctrine of self-defence, carries with it in its very bosom, the inevitable corollary, that if the quarrel be begun *without a felonious purpose*, then the homicidal act will not be *murder*. To deny this obvious deduction is equivalent to the anomalous assertion that there can be a *felony* without a *felonious intent ;* that the *act* done characterizes the *intent*, and not the *intent* the *act*. The bare statement of such a doctrine accomplishes its own ample refutation ; a doctrine inconsistent in its premises and illogical in its conclusion. The absurdity of such a doctrine may readily be shown by this syllogism : Without a felonious intent there can be no murder. A brought on a difficulty with B, and in the sudden struggle which ensued, but without felonious intent, killed him. Therefore, A is guilty of murder. Or the form of the syllogism may be varied thus : He who with malice aforethought brings on a quarrel with, and kills another, is guilty of murder, and cannot, however imminent his peril, avail himself of the doctrine of self-defence. A, without malice aforethought, begins a quarrel with, and kills B in the endeavor to save his own life from a murderous assault by the latter. Therefore A is a murderer and cannot invoke the doctrine of self-defence. Such a doctrine as this is at war, too, with the analogies of the law in similar cases ; for if two with deadly weapons engage in a sudden encounter, and one

should kill the other, the slayer will only be guilty of manslaughter.

Bishop says : "A common case is where two persons upon a sudden quarrel, engage in mutual combat; then if either one, in the heat of it, kills the other, though with a deadly weapon, the offence is, in most circumstances, only manslaughter. * * * When the combat has become mutual it ordinarily ceases to be of importance by which party the first blow was given. And, as we have seen, it makes no difference though the blow which proved fatal was, while prompted by the heat of the fight, inflicted with the intent to take life." 2 Bishop Crim. Law, sec. 701.

Redfield, C. J., takes the same view of the matter; for he says : "If the jury should regard this as a *bona fide* case of mutual combat, without previous malice on the part of the accused, and that mutual blows were given before the accused drew his knife, and that he drew it in the heat and fury of the fight, and dealt a mortal wound, although with the purpose of doing just what he did do, that is, of taking life, or what would be that intent if he had been in such a state as properly to comprehend the nature of his act, still it is but manslaughter." *State v. McDonell*, 32 Vt. 491., *loc. cit.* 541.

Speaking of *Morley's Case*, Lord Hale said : "And many who were of opinion that bare words of slighting, disdain or contumely, would not of themselves make such a provocation as to lessen the crime into manslaughter, yet were of this opinion, that if A gives indecent language to B, and B thereupon strikes A, but not mortally, and then A strikes B again, and then B kills A, that this is but manslaughter, for the second stroke made a new provocation, and so it was but a sudden falling out, and though B gave the first stroke, and after a blow received from A, B gives him a mortal stroke, this is but manslaughter according to the proverb, *the second blow makes the affray;* and this was the

opinion of myself and some others.'' 1 Hale P. C. 456..
In *Morley's Case* it was agreed that ''if upon ill words
both of the parties suddenly fight and one kill the other,
this is but manslaughter ; for it is a combat betwixt two
upon a sudden heat, which is the legal description of
manslaughter.'' 6 How. St. Tr. 769.

With these authorities and legal definitions before
us, let us examine the testimony of the defendant, sup-
ported as it is, by that of other witnesses, in all essential
particulars.    He testified :

'' About three o'clock in the afternoon of Christmas
day, 1884, James Lane and myself started from his house
to go to the coal yard where we were working, to feed
our teams.    When we started, I said to Lane that we
would go around by my house and see whether my wife
had returned home or not. (She had not returned).   We
then went over to McCoy's (who lives with Taylor).    I
went in the gate and around to the kitchen door.    The
front room and basement of the house was occupied by
Taylor, the middle room and kitchen by McCoy.    There
is a door opening from the yard into the middle room.    I
was familiar with the entrance, having been there before.
The west or front end of the house runs up to the side-
walk.    The yard fence commences at the southwest
corner of the house and runs south along the west end of
the yard.    The gate is a few feet south of the house.
There is a porch four or five feet wide and two feet high
in front of the kitchen door.    The door is on the south
side of the room.    I rapped and was waited on by Mary
Reno, now Mrs. Bunch, who invited me in.    I declined
the invitation, and told her that I had called for my wife.
At this time my wife had also come to the door, and I
asked her if she was ready to return home.    She replied
that the wedding had not come off yet,    I then said to
her :  ' It is getting late, perhaps you had better go home
now.'    She asked me to wait, then, while she prepared
the children and got her wraps, and she started into the

The State v. Partlow.

front room. Just as my wife was returning, William J. Taylor, A. J. Sollers, Clifton McCoy, and young John Sollers, came out through the middle room into the kitchen. They were walking rapidly. Taylor and Sollers were in their shirt sleeves. . Sollers had his sleeves rolled up, his collar and shirt bosom unbuttoned. I was standing on the porch, with my back to the south. Taylor stepped out on the porch, facing me. Sollers stood somewhat west of us, with his face towards Taylor and myself. Lane was west of Sollers. Lillie McCoy, Mary Reno and Mary Stephenson were part inside the kitchen door. Taylor first called me by my name and wanted me to come in. When he invited me, I replied I did not have time, that I had just called for my wife. He then said that he understood that I had come over to the wedding to raise a row. I replied that I had not come for any such purpose, that I had called for my wife to accompany her home. Mary Stephenson then spoke up and said to me, ' Yes, you did come to raise a difficulty. I heard you say so this morning.' I said, 'that's a lie.' A. J. Sollers then said to Taylor, ' Give him one, anyway, Bill,' and Taylor immediately struck at me with his right hand, clinched. I tried to avoid the blow, but only partially succeeded. The blow struck me on the left side of my head, near the eye, and staggered me backward off the porch. Taylor sprang after me, striking. He was right over me, and I was retreating towards the gate to get away. The gate was south and west of the porch. A. J. Sollers jumped off the porch, right after Taylor, and was following us, shouting, ' Give it to him, Bill, don't let him get away.' Taylor continued to press me, and Sollers was cursing and swearing in a loud voice. Taylor was over me, like, and striking. Young John Sollers was also in the yard at this time. When I had retreated in a half circle about midway from the

porch to the gate, I saw young Jack Sollers coming towards me with a neck yoke or large club, as if to strike me. I caught Taylor somewhere on his right arm, to protect myself and keep from falling. I was greatly excited. I was afraid I would go down, and that A. J. Sollers and John Sollers with the neck yoke would reach me. I thought my life was in danger, and I drew my revolver with my right hand, and, to save myself, I shot Taylor. Up to the time the shot was fired, Lane took no part whatever in the difficulty."

From this testimony it will readily be seen that, taking that testimony as true, no malicious purpose prompted the defendant, even if it be held that he "brought on the difficulty." And the defendant had the right to have an instruction based on his own testimony, and to testify as to his intent. *State v. Banks*, 73 Mo. 592. But, as already seen, he was denied any instruction which would allow the jury to consider his offence as anything less than murder in the second degree, no matter what his intent may have been, provided he "brought on the difficulty;" and if he did this, under the instructions given, his intent was immaterial, and his right of self-defence altogether destroyed. I am of opinion that he was clearly entitled to have his third instruction, modified as hereinafter indicated, given to the jury, and the intent with which he did the homicidal act considered by them, in making up their verdict. Taking, as a basis, the testimony of the defendant and of others who corroborated his statements, as true, there was ample ground for holding that he had not lost his right of imperfect self-defence by reason of anything occurring at the place of the homicide; a right which, according to the authorities, would, if there were no felonious intent actuating the defendant, reduce his offence from what would otherwise have been murder, to manslaughter. This doctrine receives my cordial concurrence. Any other doctrine is abhorrent to all my

conceptions of what constitutes reason, humanity, justice and law. Any other doctrine places on the same plane him who, with murderous malice in his heart, provokes a difficulty and slays the victim of his deadly hate, and him who, in the *furor brevis* of a casual combat, and of sudden anger, and without malice, takes the life of his assailing adversary. See *State v. Culler*, 82 Mo. 623.

II. But, granting that defendant was in the wrong; granting that, by mere words, he "brought on the difficulty," and no witness contends that he brought it on in any other way, still he had a right, after the combat began, to withdraw from the conflict; and this is what there is testimony tending to show he did in good faith try to do, and was trying to do, when pressed so hard as to be compelled to use his pistol. Taylor had struck him and knocked him off the porch, was still striking him. A. J. Sollers, who had urged on the fight in the first instance, was still doing so, following close on Taylor's heels, shouting, " *Give it to him, Bill*, don't let him get away," while John Sollers, who had followed Taylor into the yard, had picked up the neck yoke, and only some six or eight feet away, was coming towards defendant with the neck yoke in both hands, as if to strike him while he was retreating toward the gate, and it was at this juncture that he fired the shot. Taking this testimony as true, the second instruction asked by defendant should have been given; for it announces but the well settled doctrine that, though a man should be in the wrong in the first instance, yet a "space for repentance is always open, and where a combatant in good faith withdraws as far as he can, really intending to abandon the conflict," and his adversary still pursues him, then, if taking life becomes necessary to save his own, he will be justified. 1 Bishop Crim. Law [5 Ed.] sec. 871; Horrigan & Thompson on Self-Defence, 227; Foster, 276; Sir William Blackstone says: "When

both parties are actually combatting at the time the mortal stroke is given, the slayer is then guilty of manslaughter, but, if the slayer has not begun to fight, or, having begun, endeavors to decline any further struggle, and afterwards, being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide excusable by self-defence." 4 Black. Com. 184.

Treating of this subject of "retreating to the wall," Mr. Wharton aptly says : " The true view is, that a 'wall' is to be presumed whenever a retreat cannot be further continued without probable death, and when the only apparent means of escape is to turn and attack the pursuer. And retreat need not be attempted when the attack is so fierce that the assailed, by retreating, will apparently expose himself to death." Whart. Hom., sec. 485. And, in this connection, it may not be amiss to remark that Taylor had no right to offer violence to defendant in order to eject him from his house, until he had first requested him to leave his premises, and not until more gentle means had proved unavailing. On this point Bishop observes : "If a man enters another's dwelling house peaceably, on an implied license, he cannot be ejected except on request to leave, followed by no more than the necessary and proper force, even though misbehaving himself therein." 1 Bish. Crim. Law, 859 ; Whart. on Hom., sec. 552. I make this remark, because I find no evidence in the record that Taylor requested defendant to leave his premises before resorting to violence, and because of the language of the sixth instruction, given on behalf of the state. In the circumstances of this case, as already related, the language of that instruction is misleading, as not being based on any testimony of a request to the defendant to leave, and because apparently sanctioning violence at the outset, and treating that violence in the light of necessary force.

III.   Relative to the evidence of threats said to have been made towards Willis Bunch by defendant, there was no error in admitting it.   If the defendant made such threats, and also similar threats and expressions of his intention to go down to Taylor's house on the day of the wedding, evidence of threats made against Bunch would tend very materially to disclose the *animus* of the defendant in going to Taylor's house.

IV.   In regard to the rejection of testimony as to the conversation had with Taylor, by the witness Sweeney, after Taylor had been informed by DeFrance that his wound was necessarily fatal, I discover no error, and this, of itself, is a sufficient reason for such rejection: It does not appear, nor was it offered to be shown, as preliminary to the introduction of such testimony, that the declarations were "made under a sense of impending death," or with the impression on the mind of the declarant of "almost immediate dissolution."   1 Greenl. Evid., sec. 158.   The existence of such being the condition of the deceased's mind was not proven, nor offered to be proven.

For the errors heretofore noticed the judgment should be reversed and the cause remanded.   Black and Brace, JJ., concur.   Norton, C. J., dissents.   Ray, J., will express his views in a separate opinion.