STATE of Missouri, Respondent,

v.

Patrick RYAN, Appellant.

No. KCD 26312.

Missouri Court of Appeals, Kansas City District.

March 5, 1973.

J. Arnot Hill, Hill & McMullin, Kansas City, for appellant; John J. Cosgrove, Kansas City, of counsel.

John C. Danforth, Atty. Gen., David Robards, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, P. J., PRITCHARD, J., and HARRY A. HALL, Special Judge.

PRITCHARD, Judge.

By the verdict of a jury appellant was convicted of the commission of the crime of murder in the second degree of one Glen Stumbo. The jury was unable to agree upon the punishment and the court fixed the same at 30 years imprisonment in the Department of Corrections.

The main issue presented is whether the court should have included in the murder in the second degree Instruction No. 4 a finding for the jury upon the subject of provocation in accordance with the paragraph thereon in the pattern instructions prepared in 1971 by the Committee of the Missouri Jury Instructions—Criminal (MOJIC) No. 6.06. That paragraph, here omitted in Instruction No. 5, is: "Third, that defendant did not do so in (anger) (fear) (agitation) suddenly provoked by the unexpected acts or conduct of [name of victim]." And, of course, the determination of the necessity of this inclusion [which could reduce the jury's finding to manslaughter] requires an examination of the evidence as to its sufficiency to support or require such a submission.

Betty Stumbo was the wife of deceased who was a member of the Blue Springs American Legion. She attended the opening dedication of that club on October 5, 1968, arriving about 6:30 p. m. with her husband. The two ordered a beer, went through the food line and later joined others and got a seat with six other people at a table which was located to the left of the entrance and back about one table on the right-hand side of the bandstand. This was on the second floor of the building. At about 9:15 p. m., appellant approached the table just after Bob Alliett bent down and kissed Mrs. Stumbo on the forehead, because "I would say, well, I'm just like his mother." Appellant said, " 'Yeah, you're everybody's mother,' " and reached down and slapped her. She raised up to push him back, having a cigarette in her hand, -and he slapped her again. At that time fight number one between appel-

lant and deceased began. A couple of blows were struck and that fight was broken up. Mrs. Stumbo and her husband walked up the aisle apologizing for the altercation, then went back to the table where deceased sat with his back to the front entrance. Before they sat down someone walked in the door and said, apparently referring to appellant, " 'He wants to see you outside.' " The group sat there and laughed and deceased got up and danced. In about 20 to 30 minutes after the first fight, appellant came back into the hall, and as if he were going to get up, deceased pushed the chair back, and Mrs. Stumbo saw appellant with the gun, blue flame, and heard shots. Deceased said, " 'Call the ambulance, that son of a bitch shot me.' " Deceased was taken to a hospital, where, after about 20 minutes he was said to be dead.

After the first fight, Mrs. Stumbo saw blood on appellant's face. She denied putting her cigarette out in his face, but did testify, "If it burnt, it was not deliberate. I pushed him back. It was an impulse to get away from him, and that's what I did, I pushed him back." She denied that deceased hit appellant in the back of the head with a beer bottle. Deceased was five feet, five and a half inches tall and weighed about 165 pounds.

Edward Wallace Butler was present at the time of the first fight and was then dancing with his wife. He heard a scuffle and glass breaking, but did not see, at the time, who was fighting. After Edward sat down he saw deceased come back and sit down at the table, and saw that he was one of the participants in the scuffle, but did not see who the other fellow was. In about 20 minutes he saw a man walk down the aisle and hit deceased with what looked like his hand, and deceased fell off on the floor. Everybody at the table jumped up and Edward could not see any more but heard three shots fired shortly after deceased was struck. Edward then saw a man going backward toward the door with a gun in his hand motioning people back with it.

Harold William Johnson was seated at the table wtih Mrs. Stumbo and deceased. He saw appellant hit Mrs. Stumbo and saw her hit him back. Deceased jumped up and said, " 'Hey, what's going on here,' "; then appellant struck him and they got into a fight down on the floor for a minute or two. Appellant "looked like he had come out of a meat grinder." He was black and blue all over his face—deceased hit him several times. Harold did not see a beer bottle, but deceased, who had been a prizefighter, hit appellant several times with his fist, being on top of appellant on the floor. In about 15 or 20 minutes Harold saw appellant approaching from behind him and deceased. Harold said, " 'Look out, Glen, he is back with a gun.' " Deceased's back was turned to appellant, who hit deceased on the head with a .38 snub-nosed revolver. Deceased jumped up, started to turn around and appellant started shooting, three shots.

Appellant's sister, Margaret Joan Hefley, was at the American Legion hall, but did not learn that appellant had been in a fight until it was over. She went with appellant to the front door where she talked with him about going to the doctor to have his face fixed. She thought his eye was badly damaged, and his suit, shirt, eye and neck were extremely bloody. Appellant asked her to go back in and tell deceased to come out which she did. Deceased told her he was some type of a fighter and that her brother had just better go on. In another vehicle she followed appellant, who was living with her, and saw him next at the American Legion lot where he had a gun in his hand, and had changed his shirt. Appellant was then very angry. Margaret did not go back into the hall with appellant, but thereafter heard one or two shots. Later she gave what she assumed to be her brother's gun to the police. On cross-examination, Margaret testified that she had heard that deceased had a reputation in the

Blue Springs area for being a violent, quarrelsome and turbulent man. Appellant could not have been gone for more than 7 or 8 minutes before he returned to the American Legion.

Charles Robert Alliett, whose nickname is "Utlo", was present when the events here in question occurred, but was drunk. He was sitting at the table where deceased got shot, and heard three shots. As to the first fight, Utlo remembered appellant coming over and asking him to join him and some other people, and Mrs. Stumbo turned around and put a-cigarette out in appellant's face. He did not see appellant strike Mrs. Stumbo. He knew that at times deceased had a bad reputation for being quarrelsome, and being violent and turbulent.

Aubrey L. Lewis helped break up the first fight between appellant and deceased. There was a glass knocked off the table to the floor where it split down the middle and from which appellant got cut on the face. Aubrey did not see appellant shoot deceased, but saw him with the gun holding all the people back. Appellant was then dressed differently, "I think he went home and changed clothes and washed the blood off of him." It was around 15 minutes after Aubrey helped break up the fight when appellant returned with the gun.

Other witnesses for the state, James Gregory McGuire, John Barry Moore, William Parker, Dorothy Jean Parker and Roger Lee Lane, testified with some variance but substantially the same as the foregoing versions of the incidents of the night of October 5th.

For appellant, Shirley Lane, wife of Roger Lee Lane, testified that with her husband and Bob Alliett, she attended the building dedication of the American Legion. She saw appellant go to the Stumbo table where he squatted down beside Bob trying to get him to come to the Lane table. Mrs. Stumbo then reached over and burned appellant on the right side of his neck. Appellant raised up and was turning away when deceased hit him from the side, then

they started fighting. Deceased had a reputation for violence, turbulence or fighting. Appellant did not strike Mrs. Stumbo, but merely pushed her hand. Shirley did not see the shooting. It was 10 to 15 minutes at most before appellant came back to the American Legion after the first fight.

Appellant testified that he owned the weapon in evidence, having had it for about a month. As to the events of the night of October 5th, his version was this: He had gone to the American Legion alone and met some friends there. He went over to the Stumbo table to ask Bobby Alliett to come to meet some people. Appellant was then kneeling down on the left side of Bob, between him and Mrs. Stumbo, who said, " 'Get away from here, you son of a bitch, and took a cigarette, a lighted cigarette that she had, and jambed it into my neck here.' " He denied slapping her. He jumped up and started to walk away, and that was the last thing he remembered, being knocked unconscious. He came to and remembered that deceased was still beating him and his arms were stretched out and he could not move them. Then he "went out again," and recovered consciousness when he was out in the parking lot. Appellant was living with his sister in Blue Springs, and he then went home. The first thing he did was to take off his coat and shirt, which were bloody on the front. He remembered putting on a clean shirt, starting back out the door with the intention of going back up to the American Legion, and then remembered the little gun in his flight bag. He reached down and got the gun and stuck it in his pocket.

As to his purpose in going back to the American Legion Hall, appellant testified: "A. I wanted to go back there and talk to these people. It's my club. I was a member there. And I also wanted to find out who it was that—why all this came down —who it was that hit me. Q. And why did you take a gun with you? A. To protect myself while I went back there. I didn't know what these people would do." Appellant had no intention of going back

to the Legion Hall to shoot and kill deceased. "Q. And you merely took that gun along just for your own self protection? A. That's right. Q. But didn't you also say that when you walked in there that you intended to walk up to Mr. Stumbo and crack him on the head with a loaded gun? A. That, as I left the house, I had no intention of using it against anyone, and it wasn't until I entered the club and saw Stumbo sitting over there laughing, and I felt that he was probably laughing about the way I had been treated, and that made me angry." When appellant arrived deceased was sitting at the table with a few people laughing and partying. Appellant was still in pain from the beating, and was angry. "Q. Did you go over to Mr. Stumbo? A. Yes, sir, I did. Q. And what, if anything, did you do? A. I went over there with the intentions of beating him like he beat me with that pistol, and at the same time using it to hold him off of me while I was doing it, but after I struck the first blow, why, I knew right then that I was—had no chance of winning, because I was weak." Appellant did not believe that he hit deceased hard with the pistol. Appellant testified further: "A. He immediately jumped up and turned towards me and started toward me, and we were very close at that time, and I started backing up, and I was holding the gun pointed at him, and I was backing up, and he was coming toward me, and I thought perhaps since I held this gun out, that would stop him, but it didn't, he kept coming, so I fired." Deceased had his arms outstretched and his fists doubled up. The two were very close together when deceased jumped up, probably three feet apart, and appellant backed up five or six feet, with deceased coming at him all the time before the first shot fired. Appellant was "absolutely" in fear of his life, and had heard that deceased had a reputation for violence.

▆▆▆▆ As is apparent, there were two prior incidents between appellant and deceased. The first resulted in a rather severe beating to appellant by deceased. Because of the time interval, some 15 to 20 minutes, between the two incidents, it is doubtful that the beating would carry over to the subsequent occurrence so as to constitute a lawful provocation for the slaying of deceased. See State v. Hunter, Mo., 444 S.W.2d 392, 394 [3, 4], holding that *prior* threats and acts were insufficient to constitute provocation. There was, however, additional evidence for the jury to consider in determining if such provocation arose immediately before the killing and at the time of the second incident. These concerned appellant's *professed lack of felonious intent* to kill deceased, his purpose in having the gun only to protect himself, his intention to beat deceased with the pistol only in the manner in which deceased had beaten him previously. [The statutes on assaults, Sections 559.180, 559.-190, RSMo 1969, V.A.M.S., do not define a deadly weapon. The weapon here could certainly be found to have been deadly as used by appellant in striking Stumbo. Its character, however, is not conclusive on the jury. "Whether an instrument used in an assault is a deadly weapon is a question of law, where there is no dispute about the facts; but, where the instrument used is not one declared by statute to be a deadly weapon or where its character, whether dangerous or deadly, or not, is doubtful, or where its character depends on the manner in which it is used, the question whether there was an assault with a dangerous or deadly weapon is to be submitted to the jury." 6 C.J.S. Assault and Battery, § 127, p. 999. See also 6 C.J.S. Assault and Battery, § 77c "Character of Weapon", p. 933. Had appellant been charged only with assault under the aforesaid statutes, the jury could, considering the purpose and the manner of use of the weapon, and all the surrounding circumstances, have found appellant guilty of common assault only under Sec. 556.230, RSMo 1969, V.A.M.S., a misdemeanor, and it thus cannot be said as a matter of law that appellant had a felonious intent to strike Stumbo. State v.

Bevineau, Mo., 460 S.W.2d 683, 688 [9, 10], is distinguishable because there was there no ameliorating surrounding facts at all which would have tended to bolster defendant's protestations that his intent was to use the cocked and loaded pistol on the officer's head when he fired it once, and that he had no intention to kill the officer. There was present the additional fact that defendant was participating in an armed robbery.] It has been the law of this state that even if an accused has sought out the affray or difficulty, which resulted in his victim's death, if he lacks a felonious intent in so doing, the fact that he provoked the difficulty does not deprive him of the right to a manslaughter instruction. See State v. Partlow, 90 Mo. 608, 4 S.W. 14, holding that such facts give rise to the concept of "imperfect self-defense." See also State v. Davidson, 95 Mo. 155, 8 S.W. 413, 415; concurring opinion in State v. Gilmore, 95 Mo. 554, 8 S.W. 912 (main opinion 8 S.W. 359), remarking that Partlow overthrew the rule that if the accused brought on the difficulty and death ensued, he was guilty of murder no matter what his intention may have been in bringing on the difficulty; State v. Gamble, 119 Mo. 427, 24 S.W. 1030, 1032, "If, on the other hand, he had no felonious intent, intending merely an ordinary battery, and during the progress of the fight is compelled to take the life of his adversary in order to save his own, he is guilty of manslaughter; * * *"; and see Perkins on Criminal Law, Second Edition, Ch. 10, Sec. 4, " 'Perfect' and 'Imperfect' Self-Defense" in which the Partlow case is discussed; and note MOJIC 2.42, and notes and comments following.

■ Under the facts, there was sufficient evidence to justify the giving of the manslaughter instruction, as was done, on the theory of a lack of general felonious intent in the assault and battery committed by appellant upon deceased. The question is whether under the facts and the law as it presently exists appellant was wrong-fully deprived of a submission of manslaughter upon a theory of provocation for the killing. Appellant's testimony was that after he struck deceased on the head with the pistol, he knew that he had no chance of winning because of being weak. He did not believe that he hit deceased hard with the pistol. Thereafter, deceased immediately jumped up, turned toward appellant and started toward him, the two then being very close together. With the gun on deceased to stop him, appellant started backing up about 5 or 6 feet but deceased kept coming toward appellant. Appellant knew that deceased had a reputation for violence; the evidence was that deceased had been a prizefighter, and deceased had his arms outstretched and his fists doubled up. Appellant was "absolutely" in fear of his life. This evidence certainly justifies the inclusion of paragraph 3 of MOJIC 6.06 in Instruction No. 4, "Third, that defendant did not do so in (anger) (fear) (agitation) suddenly provoked by the unexpected acts or conduct of [name of victim],". The state does not contend that Paragraph Third is an incorrect statement of the law, but merely that there was insufficient evidence to justify its inclusion in Instruction No. 4. MOJIC (as submitted by the Committee on Missouri Pattern Instructions—Criminal—1971, and November 15, 1972) abandons as the law of provocation the necessity of the existence of a battery to constitute personal violence to an accused by his victim prior to the killing, as required by State v. Haynes, Mo., 329 S.W.2d 640. Haynes, however, was in State v. Williams, Banc, Mo., 442 S.W.2d 61, 64 [2, 3], held to be an incorrect announcement of the law of provocation as requiring an actual battery: "There cannot properly be one standard as to the evidence required to authorize or require the giving of an instruction on manslaughter when a person is charged with murder, and a different standard as to the sufficiency of the evidence to support a conviction of manslaughter. For this reason we cannot agree that the standard announced

in State v. Haynes as to the evidence required to authorize the giving of an instruction on manslaughter is correct." The court said that there is but one definition of manslaughter in this state, that of Section 559.070, RSMo 1969, V.A.M.S.: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." See also State v. Bruton, Mo., 383 S.W.2d 525, 528 [2–4], where it was said, "To justify reducing a homicide from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite passion beyond control. State v. Clough, 327 Mo. 700, 38 S.W.2d 36, 38 [1]"; and State v. Patterson, Mo., 484 S.W.2d 278, 280 [2].

The committee's comments on MOJIC 6.06 include this: "Paragraph Third must be added where there is substantial evidence sufficient to reduce the offense to manslaughter and where both it and second degree murder are submitted. The reason is that provocation and 'heat of passion' are not necessary constitutive elements of manslaughter (Section 559.070) and need not be included in an instruction submitting that offense alone. State v. Clark, Mo., 412 S.W.2d 493 (1967); State v. Williams, Mo., 442 S.W.2d 61 (1970). Voluntary manslaughter is a 'residual' offense, the killing of another under circumstances which make it neither murder in the first or second degree nor excusable nor justifiable homicide.

"Where the only charge is manslaughter no difficulty is encountered, and provocation and 'heat of passion' will not appear in the instructions. However, where *both* murder and manslaughter are submitted, provocation and 'heat of passion' become operative facts to distinguish second degree murder and manslaughter. In such case they will logically appear, as the *Notes on Use* require, in the second degree murder instruction."

It is obviously the thinking of the Committee that if the jury reject the hypothesis of paragraph third of MOJIC 6.06 in its negative aspects that the defendant did not kill in anger, fear or agitation suddenly provoked by the unexpected acts or conduct of his victim, then a positive application of such hypothesis (if supported by the evidence, as here) could be applied by the jury in determining his guilt or innocence of the residual offense of manslaughter on a provocation theory, but without the necessity of again placing the proposition in the manslaughter instruction.

■ By the omission of paragraph third of MOJIC 6.06 in Instruction No. 4, appellant was deprived of a theory of his defense to the murder charges, and the jury was not given an option to consider the evidence upon provocation by which it could, in its function, mitigate the offense of murder to manslaughter.

Appellant claims also that Instruction No. 4 erroneously omitted a hypothesis upon the matter of justifiable homicide as per MOJIC 6.06. Since the case must be retried, an appropriate instruction (in accordance with what the evidence may be) may be framed under MOJIC 2.40 upon the subject of self defense and the negative thereof as contained in MOJIC 6.06, paragraph fourth. The point need not be further noticed herein.

The *judgment is reversed and the case is* remanded for new trial.

All concur.