**STATE of Missouri, Respondent,**

v.

**Edward Leon BOOKER, Appellant.**

**No. KCD 26255.**

Missouri Court of Appeals,
Kansas City District.

Dec. 3, 1973.

Philip H. Schwarz, Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant; Paul T. Miller, Executive Director, Willard B. Bunch, Chief Defender, Kansas City, of counsel.

John C. Danforth, Atty. Gen., Daniel P. Card, II, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, C. J., and PRITCHARD and SOMERVILLE, JJ.

PRITCHARD, Judge.

Contending for outright reversal, or a reversal and a remand for new trial, of his conviction of murder in the second degree, appellant claims: That his conviction "was not supported by the weight of the evidence"; and, the dispositive issue, that the trial court erred in failing to instruct the jury on the offense of manslaughter, there being evidence to support it.

The jury found appellant not guilty of murder in the first degree, but guilty of murder in the second degree. It was unable to agree upon punishment and the court therefore first assessed it at 35 years, then reduced it and imposed punishment at 25 years imprisonment in the Department of Corrections.

■ Appellant's first point that his conviction was not supported by the weight of the evidence presents no reviewable issue. The matter of the "weight of the evidence" is solely an issue for the trial court in ruling on the motion for new trial. State v. Talbert, 454 S.W.2d 1, 4[6] (Mo. 1970), and cases cited. In the argument portion of his brief, however, appellant clearly attacks the *sufficiency* of the evidence to support the conviction, and the point will be so treated.

Marcella Rogers was working at her job as night supervisor for the American Cab Company, 1029 Troost Avenue, Kansas City, Missouri, on the night of October 26, 1971. At about 9:15 p.m., a small Negro male, Cleodies Johnson, known as "Shorty" came up to her office window with appellant. Appellant started beating Shorty and after he finished "he reared back and kicked him [Shorty] in the stomach." Shorty then got away from him and ran into the office where Marcella was and ran behind her. Appellant followed, but Marcella stopped him at a doorway and "told him he had better get out of there if he knew what was good for him" and appellant said " 'Well, just tell him to get out here where he belongs.' " Marcella closed the door and locked it, and appellant left. She told Shorty to sit in the office, and then she called the police. As she went back into the office to tell Shorty she had called the police, he had already walked out and was sitting on a bench in the ga-

rage where he was bleeding "pretty bad." Marcella did not see appellant stab Shorty, nor did she ever see a knife. The police officers then came, and an ambulance came and took Shorty away after he had been with Marcella about 6 or 7 minutes. There was blood on the garage floor, and on Marcella's back where Shorty had run behind her.

Patrolman Frank James Seckinger arrived at the scene and saw Shorty lying on the bench on the east side of the garage, and just to the north of him, he saw a trail of blood on the floor. Seckinger determined that Shorty's breathing was shallow and that he appeared to be in pain and he ordered an ambulance. Shorty had a laceration on his forehead, and also a laceration 2 or 2½ inches under his left nipple. Later, Seckinger went to the hospital to check on Shorty's condition and found that he was dead on arrival.

On the night in question, William King saw appellant talking to Shorty about a watch. Shorty took the watch and tried to run, when a struggle took place. Shorty ran past the cab company, and came back, and appellant and he started fighting. "Q. Did you see this man hit Shorty? A. They both was hitting each other." Shorty ran into the cab company with appellant following and they were fighting in there. As appellant came out, King "saw a little handle of something sticking out of his hand," and he was folding his hands. Shorty was bleeding when he later came out.

Harold Tuttle, then a tow truck driver for American Cab, was standing outside its building around 9:00 or 9:15 p.m., on October 26th. He saw Shorty walking north from 12th Street and spoke to him. Tuttle saw appellant walking toward them, and Shorty came back and said he wanted a ride home. As Tuttle went to call a cab, appellant and Shorty started struggling, "just having a fist fight a little bit", and appellant said, "He won't need a cab." "Q. All right. Then did you observe this man do anything? A. Yes, he pulled a knife out of his back pocket. Q. What kind of a knife? A. A big pocket knife. Q. Fold-up type pocket knife? A. Yes. * * * Q. All right. Did you see him do anything with the knife? A. No. He had it in his hand at the time. Q. Can you show the jury how it looked to you, how he had it in his hand, like this (indicating)? A. Yes, just like that (indicating). Q. All right. Did you see him hit Shorty with that knife in his hand? A. Well, when they started struggling, yes, inside the garage." Thereafter, Shorty broke loose and went inside the office and appellant followed him. Appellant said, "That'll keep you from messing with my women.", and walked away. Shorty was trying to walk out and fell down, "Because he was stabbed." He was bleeding, and Tuttle picked him up and sat him on the bench. There was no question in Tuttle's mind that appellant was the man he saw with a knife hitting Shorty Johnson. Dr. David Zoller, pathologist, testified that Shorty died as a result of a penetrating stab wound in the left chest, which perforated the heart in the left ventricular chamber.

 Appellant says, "Nowhere in the record is there any evidence to show that the assailant entered the garage with the intent to take the victim's life, or that the assailant displayed any malice or premeditation." Under the facts above related and the case of State v. Hammonds, 459 S.W. 2d 365 (Mo.1970) and cases cited, appellant's assertion is without merit. Here, according to witness Tuttle, appellant followed Shorty, drew a knife from his hip pocket and struck Shorty with it. The knife wound was the cause of death. In Hammonds, the appellant made practically the same argument as to the sufficiency of the state's case as is here made. Clearly here, appellant struck Shorty with the knife intentionally, and he is presumed to have intended death in so doing, and he is also presumed to have intended the natural and probable consequences (death) of his

own intentional act. The necessary malice may be presumed also from the intentional killing with a deadly weapon, and the premeditation to do the act need exist only for a moment. See the discussion and cases cited in Hammonds, loc. cit. 459 S.W.2d 368 [1–4]. Additionally here there are the statements made by appellant when he and Shorty were struggling that "He won't need a cab", and as appellant walked away, "That'll keep you from messing with my women." Under all the evidence, appellant's guilt and any contradictions and inconsistencies in the testimony of witnesses as bearing upon their credibility were for the jury to determine, and the court did not err in submitting the charge of murder in the second degree to the jury.

■ The evidence here on the part of the state shows rather conclusively that appellant and Shorty were fighting, and that they were hitting each other up to the time the fatal knife blow was struck. The evidence further shows that appellant followed Shorty into the cab company, from which the jury might have found that appellant sought out the difficulty. Under State v. Partlow, 90 Mo. 608, 4 S.W. 14 (1887), even if an accused brought about the difficulty which resulted in his victim's death, if he lacks a felonious intent in so doing, the fact that he provoked the difficulty does not deprive him of the right to a manslaughter instruction. See also State v. Harlan, 240 S.W. 197, 202 [6] (Mo. 1922) and cases cited; and compare State v. Ryan, 492 S.W.2d 116, 120 et seq. (Mo. App.1973). Here, there is not " 'an entire absence of evidence upon which to rest a verdict of guilty of manslaughter.' " State v. Ayers, 470 S.W.2d 534, 538 (Mo.1971). And as above held, there is here a sufficiency of evidence to support the conviction of murder in the second degree. Ayers holds further, which holding must con-

trol here, "This being true, it was the duty of the trial court to instruct as to murder in the second degree and manslaughter *and to leave to the jury the fact question* whether appellant acted with premeditation and malice." Consult also State v. Jackson, 496 S.W.2d 1, 2 [2] (Banc, Mo.1973). See State v. Hubbard, 484 S.W.2d 224, 226 (Mo.1972), reiterating the rule that " 'The authorities are fairly harmonious in holding that, in order for a homicide to be reduced from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. It is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder is absent, and therefore the crime is not murder, but manslaughter.' " See also paragraph third of the pattern murder, Second Degree Instruction 6.06 (MOJIC), adopting substantially the words of the rule in Hubbard. Here whether the fight, and striking blows, between appellant and Shorty induced in appellant, anger, fear, or agitation suddenly provoked by Shorty's unexpected acts or conduct, were for the jury to determine on the issues of premeditation and malice. Thus, the trial court erred in failing to give an instruction on manslaughter.

The parties are apprised of other questions relating to admission of testimony in the case and they are not likely to arise on new trial, and need not be ruled.

The judgment is reversed and the case is remanded for new trial.

All concur.