Ruffin, C. J.
 

 The counsel for the prisoner complains of only one part of the instructions to the jury. It is that, in which his Honor stated, that, if, at the time the prisoner passed the witnesses and said to them, “Boys don’t see me, I intend to cut off his coat,” he intended to kill the deceased, and, when he met the deceased, carried .that intention into execution by stabbing him, -he was guilty of murder, although, at the time he did the act, he was excited by passion. It is said, this instruction was erroneous, because it put the grade of the offence on the existence of an intention to kill, when-the .prisoner was going to the deceased; whereas such an intention is common both to murder and manslaughter, and the enquiry, therefore, in each case is, whether the intention was inspired by malice or deliberate ill will towards the deceased, or was the impulse of sudden passion and heat produced by adequate provocation ; and it is further said, that here the instruction assumed, that such heat of blood had been excited by the previous combat and continued to the fatal strokes. It is thence inferred, that the killing was but manslaughter.
 

 The first step in our enquiry is, whether that be the propej construction of the language of the judge ; whether the excitement of passion was assumed, in the hypothesis, to have been created by the first contest and to have continued to the last. We think it is not. It is to be recollected that there was a.combat in the piazza; andthatthe.case presents something from which it might have been contended for the prisoner, that there was also a sudden mutual combat, when Che parties again rfiet in the yard for the last time. The counsel for the prisoner insisted on the trial, that the of-fence was manslaughter; but whether it was so, by reason that the provocation arose out of the first encounter, or out of the last exclusively, the exception does not explicitly state. It seems to ns, that his Honor could not have understood the former ; and that, in closing this part of his in
 
 *119
 
 structions, he had in view an excitement that might have risen, or was supposed to have arisen-, subsequently to the prisoner’s passing the witnesses. As to the heat of blood produced by the previous combat, it had just been disposed of in a manner most favorable to the prisoner, by the instruction, that, if the prisoner, in a short time after receiving the blows and scratches in the piazza, and being excited by passion and smarting under those blows, had, in a moment of sudden revenge, stabbed the deceased, it would be manslaughter only. Of the correctness of that position in point of law, we are not called on at present to- express an- opinion. As applicable to the facts in this case, it might perhaps be found, upon reconsideration.to go beyond the law, in allowing a cruel and inordinate revenge, executed with a deadly instrument not shewn openly, for a very trivial offence, and that induced by the prisoner’s own outrages.. But this passage in the charge makes it very clear, that his Honor did not have reference, in the latter part of his observations, to-an excitement of passion from the fight in the piazza ; since that would render the two parts of the charge directly contradictory. For in the one he says expressly, that killing,, while excited by passion from those blows, would be manslaughter ; while, it is attempted to be inferred, that in the other he meant, that the killing was murder, though perpetrated under the sa.me excitement of passion. Besides the particular terms of the part of the charge excepted, to — which, are “although,
 
 at the time he did the
 
 act, he was excited by passion” — shew that the passion meant was one springing, out of the last contest itself. Indeed, but a moment before, the Court had treated the prisoner as being, when passing the witnesses, free of passion and possessed of deliberation, by speaking of him as then intending some sportive or malicious mischief, short of serious bodily injury, or as then intending to kill the deceased. The fair interpretation, therefore, is that before mentioned — that although something might have arisen, when the prisoner got up to the deceased, to rouse his passion, yet that would not extenuate the homicide to manslaughter, if, when the prisoner passed the
 
 *120
 
 witneses and went up to the deceased, being before ibis new provocation arose, the prisoner had formed the intention to' kill. And that position we think good law. We do notin-deed perceive anything, that shews the prisoner to have been under a transport of passion during the last rencounter. Far from it. But supposing that to have
 
 been so, yet
 
 if the prisoner sought the deceased and entered into that fight, with the purpose, under the pretence of fighting, to stab him, it was clearly murder ; no matter what provocation was apparently then given or how high the prisoner’s passion rose during the combat; for the malice is express and was promptly wreaked, and puts the idea of provocation out of the case.
 

 If the prisoner meant to insist, that his blood had not cooled, and that there had not been sufficient cooling time between the first and last meetings, he should have prayed an instruction distinctly to that effect. Having omitted himself to do so, he cannot complain of the omission of the court. But we hold the opinion, that he would not have been entitled to the instruction, if he had asked it. For. although the provocation supposed was recent, yet it does not seem to have wrought any height of passion, suspending reason, even at the very first; and, even if it did, it is evident that it had subsided. It cannot be conceived, that a person, who had received so very slight a hurt from a drunken man, ill return for the aggression practised by the prisoner; who voluntarily terminated the scuffle, and calmly went into the house, giving no external indication of anger; who, in the interval, held such mirthful or guileful discourse with the winesses as to his intentions towards the deceased ; who was advised by those persons to desist, and yet proceeded to the deceased, and, as they met, expressed a desire to be parted, which must have been pretended, and uttered a mock cry of distress during the affray, when he was giving the other party fatal stabs, to the number of seven, and was receiving no serious hurt himself; who of his own accord separated from his antagonist, and had the coolness,instantly after this mortal combat, to call for water to-wash his hands, and frame
 
 *121
 
 fne falsehood that he believed the deceased had cut his finger: we say, it cannot be conceived, that a person thus ing was under a sudden transport of passion. The vengeance was that of a bad heart and deliberation, and not infirmity from heat of blood. There Ought not, therefore, to be a new trial.
 

 There is also a motion in arrest of judgment for alleged defects in the indictment.
 

 The first is, that it does not appear in the indictment, that it was found in
 
 North Carolina,
 
 or that the offence was committed in> this State. But the County, Edgecomb, is in the margin and in the body of the bill; and that is sufficient. So are all the precedents in the books. The indictment was found in the Superior Court of Edgecomb, and the Judge must know that he was holding a court in that county of the State, and for the State of North Carolina.
 

 Another objection is, that the indictment sets forth the time thus : “ on 'the third day of August,
 
 eighteen hundred and forty three,”
 
 without saying “ the year of our Lord,” or even using the word “ year.” This, we think, would have been fatal at common law; and we cannot but express a regret, that there should be, needlessly, a departure from the ancient forms, in a point, in which conformity is so easy and contributes so much to precision, even though it be not necessary. But we are obliged, by previous adjudications, to hold, that under the act of 1811, Rev. Stat. c. 35, s. 12, this indictment is sufficient. Indictments in the County and Superior Courts are now placed on the same ground. In
 
 The State
 
 v
 
 Dickins,
 
 1 Hay. 406, the time was stated in figures, and held good, because the meaning was as well known to the Court as if expressed in letters, and the indictment was therefore “ intelligible,” as required in the act of 1784. So, when the caption was “Fall Term, 1822,” and the indictment charged the time to be “the first day of August in the present year,” it was sustained.
 
 State
 
 v
 
 Haddock, 2
 
 Hawks, 461. It will be observed, that in neither of those cases did the indictment expressly refer to the Christian era or any other epoch ; but they were, neverthe-
 
 *122
 
 ]ess, sustained as expressing a certain time, because the Court understood them as referring to the era of our Saviour, as that is the universal reference in judicial proceedings here, as well as in common usage. This indictment was found in the year 1843, and that being in fact the year of the Christian era, it is judicially intended to mean the year of that era.
 
 f
 

 Consequently, the opinion of the Court is, that there is no error in the record; and this must be accordingly certified to the Superior Court.
 

 Per Cura am, Ordered accordingly.