[No. 2152]
# STATE OF NEVADA, RESPONDENT, *v.* FRANK HUBER, APPELLANT.

[148 Pac. 562]

1. HOMICIDE—EVIDENCE—ADMISSIBILITY.
    In a prosecution for murder, evidence that the deceased sent the witness an order upon defendant for a certain amount, which defendant had not paid, was erroneously admitted; since it was immaterial, and tended to prejudice the jury against defendant.

2. HOMICIDE—SELF-DEFENSE—PURPOSE OF ATTACK.
    If one makes an attack upon another for the purpose of committing a felony and wreaking his malice upon the person attacked, and the person so attacked makes a counter attack and is slain, the plea of self-defense is not available; but, where the original attack by accused was not with felonious intent, he may plead self-defense.

3. HOMICIDE—EVIDENCE—REPUTATION OF DECEASED.
    In a prosecution for murder, exclusion of evidence tending to show that deceased had the reputation of being of a violent, turbulent, and dangerous disposition was erroneous, where defendant had made no assault upon deceased, and where consequently the plea of self-defense was available.

4. ASSAULT AND BATTERY—HOMICIDE—SELF-DEFENSE—AGGRESSION— "ASSAULT."
    In a prosecution for murder, evidence *held* not to show that defendant made the first assault upon deceased; an "assault" requiring an attempt to carry the intent to assault into execution by an overt act.

5. CRIMINAL LAW—ELEMENTS—"ATTEMPT TO COMMIT CRIME." ·
    An act done with intent to commit a crime, and tending, but failing, to accomplish it, is an attempt to commit that crime (citing 1 Words and Phrases, Attempt to Commit Crime).

6. CRIMINAL LAW—OPINION EVIDENCE—REPUTATION.
    A person's general reputation may not be established by the opinion of the witness, but by the reputation he bears in the community in which he lives. ·

APPEAL from the Fourth Judicial District Court, Elko County; *E. J. L. Taber*, Judge.

Frank Huber was convicted of murder in the first degree, and he appeals. **Reversed.**

*James Dysart* and *J. M. McNamara*, for Appellant:

The evidence in regard to a certain order drawn upon appellant by deceased, and sent through the mail to witness Rutherford some time during the fall of 1911, was

too remote, and could in no way bind this appellant; and such testimony was not admissible under any rule of evidence. This testimony was necessarily prejudicial to the defendant. (12 Cyc. 390; *People* v. *Carpenter*, 68 Pac. 1027; *People* v. *Wilson*, 59 Pac. 581; *People* v. *Arlington*, 55 Pac. 1003; *People* v. *Lynch*, 55 Pac. 248.)

The ruling of the trial court in excluding the character evidence offered by appellant for the purpose of proving that deceased was a violent, turbulent, disagreeable and dangerous man, clearly deprived appellant of a substantial right, in that it not only lessened but practically deprived him of his right to show self-defense. (21 Cyc. 908, 909; *People* v. *Lombard*, 17 Cal. 316.) Testimony as to the character of the deceased is always admissible where the issue of self-defense is made. (Wigmore on Evidence, sec. 246; Jones on Evidence, vol. 1, sec. 156; Thompson on Trials, vol. 2, sec. 2160; *State* v. *Thompson*, 88 Pac. 583; *State* v. *Jones*, 139 Pac. 441, 446; *State* v. *Shafter*, 55 Pac. 526.)

Where a defendant claims to have acted in self-defense, any evidence tending to show that he acted as a reasonable and prudent man would have acted under the circumstances is competent. (*People* v. *Powell*, 25 Pac. 481, 486.) When it is doubtful whether or not the homicide was committed with malice, or from a well-grounded apprehension of danger, the defendant has a right to show the quarrelsome and dangerous reputation of the deceased. (*State* v. *Feeley*, 3 L. R. A. n. s. 351, 373; *State* v. *Pearce*, 15 Nev. 188; 29 Cyc. 956; *People* v. *Young*, 63 Pac. 837.)

In order to constitute one an aggressor, he must have provoked the difficulty with the intent to either kill his adversary, do him great bodily harm, or afford a pretext for wreaking malice upon the adversary. (1 Words and Phrases, 271; *Foutch* v. *State*, 95 Tenn. 711, 45 L. R. A. 687; *Smith* v. *State*, 8 Ga. 402; *Daniel* v. *State*, 10 Ga. 261; *Brown* v. *State*, 58 Ga. 212; *Hash* v. *Com.*, 88 Va. 172; *Cotton* v. *State*, 31 Miss. 504; *Radford* v. *Com.*, 5 S. W. 343; *Airhart* v. *State*, 51 S. W. 214; *Beard* v. *State*, 81 S. W. 83; *Carter* v. *State*, 35 S. W. 378; *Johnson* v. *State*, 10 S. W. 235; *Allison* v. *U. S.*, 40 L. Ed. 395.)

Testimony as to the good character of the defendant was admissible. (*State* v. *McClellan*, 17 Ann. Cas. 106.)

*Geo. B. Thatcher*, Attorney-General, *E. P. Carville*, District Attorney, and *Chas. A. Cantwell*, Deputy District Attorney, for Respondent:

Mere remoteness of time is not alone sufficient to render testimony incompetent or inmaterial. There is nothing in the ruling or language of any of the five cases cited by appellant that even remotely touches upon the point raised as to the admissibility of the testimony of Rutherford.

"On prosecution for homicide, evidence of the bad character of the deceased is irrelevant." (Wharton's Criminal Evidence; *State* v. *Wethers*, 54 South. 290; *State* v. *Pearce*, 15 Nev. 188.)

One who commences an assault, which is resisted with violence, is not excused in going to the extent of taking life in avoiding danger to his own life which arises by reason of the violence of the party whom he has assaulted. Nor can it be denied that the authorities concur to the effect that the rights of self-defense revive in favor of the original aggressor only after he has abandoned his purpose and has withdrawn and clearly made known his desire for peace to the other party. (1 McClain, Cr. Law, 310; Wharton, Cr. Law, 485, 486; Bish. Cr. Law, 843, 865; *State* v. *Spears*, 46 La. Ann. 1524, 16 South. 467.)

Evidence that the deceased was of a violent and turbulent disposition was inadmissible and immaterial, where the accused was the aggressor. (*Winter* v. *State*, 26 South. 949; *Morrison* v. *Com.*, 74 S. W. 277; *State* v. *Napoleon*, 28 South. 972; *Campbell* v. *Territory*, 125 Pac. 717; *People* v. *Edwards*, 41 Cal. 640; *Gardner* v. *State*, 17 S. E. 86.)

If the defendant in any way challenged the fight, and went on, he cannot afterwards maintain that in taking his assailant's life he acted in self-defense. (Wharton's New Crim. Law, secs. 613, 614, 615.) There is no right of self-defense where the defendant has previously brought on the assault. (2 Thompson on Trials, sec.

Evidence of defendant's character means evidence of

his general reputation. Witnesses are not, as a general rule, authorized to give the results of their own personal experience and observation. (*State* v. *Pearce,* 15 Nev. 188.)

By the Court, COLEMAN, J.:

The appellant, who will hereafter be designated the defendant, was convicted of murder in the first degree, and from a denial of the motion for a new trial and the judgment, appeals to this court.

It appears that on the 20th of August, 1913, William Billings, the deceased, went to the town of Mountain City, and after arriving inquired where the defendant could be found. Being informed by one George Anderson that the defendant was in the house where the defendant and his mother resided, the deceased, in company with said Anderson, proceeded to the residence and made search for the defendant, and, failing to find him, went to a cabin a short distance from the house, where defendant was asleep. Deceased awoke the defendant and demanded of him payment of an alleged indebtedness of $25. Defendant insisted that he did not owe the debt; whereupon deceased struck him in the face, and took the defendant by the collar and led him to the defendant's barn in search of a saddle which the deceased said he was going to take in payment of the indebtedness. The evidence tends to show that while in the barn the deceased again assaulted the defendant, and, not finding the saddle at that place, proceeded to the barn of one Rutherford in search of the saddle, where it was found and taken by the deceased and put into his buggy. It appears that at no time did the defendant resist the assaults of the deceased.

After having a meal and attending to some other matters, the deceased, in company with his wife and little daughter, left Mountain City, driving in the direction of his home. The defendant, shortly after the departure of the deceased, having in his possession a gun which he had prior to the time deceased left, procured a horse, and,

according to his theory, started to the residence of a neighbor to get and return to his home a couple of horses which had escaped from his possession. It is also contended by the defendant—of which there is evidence—that the defendant made a practice of carrying a gun when traveling around the community. On arriving at the home of one Stinton, a short distance from Mountain City, the wife and daughter of the deceased got out of the buggy and went into the house, the deceased proceeding to the barn, where, in company with T. B. Stinton, he was unhitching the horses, when defendant rode up. Upon arriving at a point about twenty steps from the barn, and while in the road, the defendant dismounted, and with the shotgun under his arm walked a few steps ahead of the horse, which he was leading, and turning to the deceased said: "Billings, I want that saddle, and I want it right away." Deceased pointed over his shoulder and said: "There is your saddle, Jerry; there is your saddle." At this time defendant held the stock of the gun under his arm; the muzzle of it being turned toward the deceased. At this point the deceased walked at a medium gait towards where the defendant was standing. The defendant demanded that the deceased stop when the deceased was about fifteen steps distant from the defendant. The deceased, however, kept going towards the defendant. Defendant again demanded that the deceased stop, but deceased ignored his command, and continued on towards where the defendant was standing, and, when he got within a few feet of the defendant, the defendant again demanded that the deceased stop, but, instead of doing so, he made a lunge for the gun, whereupon defendant stepped back a couple of steps, and, jerking the gun slightly to the side, fired; the discharge killing the deceased.

[1] It is urged that the court erred in admitting in evidence, over the objection of the defendant, certain testimony of one Rutherford, who gave evidence to the effect that the deceased in 1911 sent the witness an order upon defendant for $25, and which the defendant had

not paid.  It appears from the testimony of the witness Anderson, who was the only eye-witness to most of the trouble in Mountain City, that the trouble at that place grew out of this alleged indebtedness, which the deceased claimed to be due him, and which the defendant steadfastly maintained he did not owe.  From a reading of the entire record in this case, we are unable to see that the testimony of Rutherford could throw any light upon what transpired on the day of the homicide.  The only effect it could have had, coming, as it did, at a time when all that had transpired at Mountain City had been related, was to prove the indebtedness, and thus prejudice the jury against the defendant.  We are clearly of the opinion that the court should have sustained the objection to the evidence offered.

[2] Error is also assigned to the giving by the court, over the objection of defendant, of the state's requested instruction No. 25, which reads as follows:

"The jury are instructed: That if you believe from the evidence, beyond a reasonable doubt, that the defendant armed himself with a deadly weapon for the purpose of seeking the deceased, and that the defendant then followed the deceased from Mountain City to the Stinton ranch, and that the defendant there attacked the deceased with a deadly weapon, then I instruct you that the defendant was the aggressor.  And if you likewise find that the deceased thereupon made a counter attack upon the defendant which was such as to excite the fears of a reasonable man that the deceased was about to take the life of the defendant or do him great bodily harm, still the defendant must be held to remain the aggressor, unless you shall likewise find from the evidence that the defendant in good faith had declined further combat, and had fairly notified the deceased, as a reasonable man, that he had abandoned the contest. And if you should find that the circumstances were such, arising from such counter attack, that the defendant could not so notify the deceased, the danger in which the defendant then stood was brought upon himself by his own fault, and he cannot justify the killing of the

deceased under a plea of self-defense. And I further instruct you that an attack is an opening or commencing act of hostility."

It is urged by counsel for appellant that this instruction is defective, in that it does not embody the element of the intent with which the alleged original assault was made by the defendant, claiming that, if the defendant did not intend to commit a felony in making the original attack, he was entitled to plead self-defense in killing the deceased.

The Supreme Court of Missouri, in the case of *State* v. *Partlow*, 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31, reviews some of the cases in point which had been decided prior to the rendition of that opinion, and says:

"In all of these cases I have cited, and I might have cited 'a great cloud of witnesses' to bear testimony to this well-established legal principle, the idea is made prominent that the main feature in such cases is the intent with which the accused brought on the quarrel or difficulty; if with no felonious intent, no harboring of malice, no premeditated purpose of doing great bodily harm, or killing the person assaulted or with whom the quarrel is begun, then the accused is not a murderer, let the result of the difficulty turn out as it will."

The Supreme Court of Appeals of Virginia, in the case of *Hash* v. *Commonwealth*, 88 Va. 194, 13 S. E. 405, uses the following language:

"Horrigan and Thompson, in their cases in self-defense (page 227), in a note to *Stoffer* v. *State,* 15 Ohio St. 47, 86 Am. Dec. 470, cited in *State* v. *Partlow,* 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31, give an admirable summary of the authorities on this subject as follows: 'If he [the slayer] provoked the combat or produced the occasion, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he provoked the combat, or produced the occasion, without any felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defense will be manslaughter only.' Here

is a clear recognition of the doctrine that, although the slayer provoked the combat, or produced the occasion, yet, if it was done without any felonious intent, the party may avail himself of the plea of self-defense. In the case of *State* v. *Partlow, supra,* the learned judge, delivering the opinion, cites, in support of this doctrine, *State* v. *Lane,* 26 N. C. 113; *Reg.* v. *Smith,* 8 Car. & P. 160; *Slaughter's Case,* 11 Leigh, 681; 37 Am. Dec. 638; *Murphy* v. *State,* 37 Ala. 142; *Adams* v. *People,* 47 Ill. 376; *State* v. *Hildreth,* 31 N. C. 429, 51 Am. Dec. 364; *State* v. *Hogue,* 51 N. C. 381; *State* v. *Martin,* 24 N. C. 101; *Atkins* v. *State,* 16 Ark. 568; *Cotton* v. *State,* 31 Miss. 504; *Stewart* v. *State,* 1 Ohio St. 66; *State* v. *Hill,* 20 N. C. 629; and 2 Bish. Crim. Law, sec. 702, *supra;* and by way of enforcing this well-settled legal principle, the learned judge makes this remark: 'Indeed the assertion that one who begins a quarrel or brings on a difficulty with the felonious purpose to kill the person assaulted, and accomplishing such purpose, is guilty of murder, and cannot avail himself of the doctrine of self-defense, causes with it in its very bosom the inevitable corollary that, if the quarrel be begun without a felonious purpose, then the homicidal act will not be murder. To deny this obvious deduction is equivalent to the anomalous assertion that there can be a felony without a felonious intent; that the act done characterizes the intent, and not the intent the act. The bare statement of such a doctrine accomplishes its own ample refutation; a doctrine inconsistent with its premises and illogical in its conclusion. In the light of this well-settled doctrine, it is manifest that the trial court erred egregiously in saying to the jury that "a man cannot in any case justify the killing of another on the pretense of self-defense, unless he be without fault in bringing the necessity of so doing upon himself." ' Recurring now to the rule laid down by Bishop that, if the individual assaulted, being himself without fault, reasonably apprehends death or great bodily injury to himself unless he kills the assailant, the killing is justifiable, the inquiry presents itself: What 'fault' is it that

will deprive a man of his plea of justifiable self-defense? This question has already been answered by the authorities cited. It is the 'fault' of seeking and directly bringing about the occasion for the killing, limited, however, by the intention with which the occasion was brought about. Inasmuch, therefore, as the right of a party accused of a felonious homicide to avail himself of the plea of justifiable self-defense depends upon the intent with which he provoked the difficulty, and inasmuch as it is the doctrine of the law that no man is to be punished as a criminal unless his intent is wrong, and as the intent is a fact to be found by the jury, then in every case where the evidence creates any doubt as to the character of the intent the court should instruct the jury as to the distinction between perfect and imperfect defense, as applicable to the particular circumstances attending the homicidal act of the accused. (*Meuly's Case,* 26 Tex. App. 274, 9 S. W. 563, 8 Am. St. Rep. 477, and authorities cited.)"

The Supreme Court of Tennessee, in *Foutch* v. *State,* 95 Tenn. 716, 34 S. W. 424, 45 L. R. A. 690, uses the following language:

"In order to make a man guilty of murder who is the 'aggressor' or 'in fault,' or who 'provokes a difficulty' in which his adversary is killed, he must have provoked it with the intent to kill his adversary, or do him great bodily harm, or to afford him a pretext for wreaking his malice upon his adversary [citing cases]. In order to deny such party the right to rely on the plea of self-defense, it must appear that he was the 'aggressor' or 'in fault,' or 'provoked the difficulty' in such a way and with such intent as the law contemplates in the use of these terms. It is not every 'aggression' which produces a difficulty that is an unlawful one within the meaning of this phrase, nor is it every 'fault' which a man might commit that precludes him from defending himself when violently assaulted or menaced, nor is it every 'provocation of a difficulty' which robs him of the right of self-defense."

"Where a difficulty is intentionally brought on for the purpose of killing deceased, the fact of imminent danger to the accused constitutes no defense; but when the accused embarks in a quarrel with no felonious intent, or malice, or premeditated purpose of doing bodily harm or killing, and under reasonable belief of imminent danger, he inflicts a fatal wound, it is not murder but may be manslaughter. (*Wallace* v. *U. S.,* 162 U. S. 466, 16 Sup. Ct. 859, 40 L. Ed. 1039.) See, also, Wharton on Homicide, sec. 198; *State* v. *Partlow,* 90 Mo. 608, 4 S. W. 14, 59 Am. Rep. 31; *Adams* v. *People,* 47 Ill. 376; *People* v. *Hayes,* 9 Cal. App. 301, 99 Pac. 388."

In a case where the defendant was alleged to have been the original aggressor, the Supreme Court of Colorado uses the following language:

"If, however, the wrongful intent or act was not felonious, but merely done with the intent to commit a simple assault or a misdemaenor, and in the struggle thus brought on the defendant kills his antagonist, while it is true he would not be excused or justified—therefore not entitled to an acquittal—yet the defense may properly be interposed as legitimate, and as bearing upon the degree of the homicide, to aid the jury in determining whether it be murder or manslaughter." (*Boykin* v. *People,* 22 Colo. 506, 45 Pac. 423.)

From the decisions cited and quoted from it appears to be the rule that, if one makes an attack upon another for the purpose of committing a felony and of wreaking his malice upon the person so attacked, and the person thus attacked makes a counter attack and is slain, the plea of self-defense is not available; but, if such attack is not made with a felonious intent, the plea of self-defense is available. We are of the opinion that the intent with which the defendant made the alleged attack upon the deceased at the Stinton ranch is material, and should have been covered by the instruction.

[3] Error is assigned to the ruling of the court in excluding evidence offered by defendant to show that deceased had the reputation of being of a violent, turbulent and dangerous disposition. The ruling of the learned

trial judge was based upon the well-established rule that
self-defense is not available as a plea to a defendant who
makes an assault for the purpose of forcing a deadly
issue, and thus, through his initiative, malice, and fraud,
creates a real or apparent necessity for the killing, and
consequently the reputation of the deceased for being of
a turbulent, violent, and dangerous disposition is not
material, and should not go to the jury. To enable us to
determine if the position of the trial court was sound,
we must look to the facts immediately preceding and
surrounding the homicide, and for a complete under-
standing of the situation we quote the material evidence,
which is as follows:

"Q. Now, at the time you first saw Jerry Huber, as
you have testified, just what were you doing, and just
what was Mr. Billings doing? A. We were just leading
the horses around from the tongue; just turning around
from the buggy.

"Q. At the time you first noticed Jerry Huber was he
on his horse? A. Yes, sir.

"Q. Did he remain on his horse? A. No, sir.

"Q. Where did he dismount? A. In the road.

"Q. About how far was that from where you and Mr.
Billings were standing? A. About—oh, somewheres
around seventeen steps, I guess. * * *

"Q. Did you notice how the defendant held that shot-
gun at that time? A. Yes, sir.

"Q. How? A. Held the stock of the gun under his
arm. * * *

"Q. What, if anything, did the defendant, Jerry Huber,
do when he got off his horse? A. Walked a few feet in
front of him.

"Q. In front of the horse do you mean? A. Yes, sir.

"Q. Did he speak any words or make any motions, or do
anything else at that time? A. Do you mean after he
walked up in front of his horse?

"Q. No; at the time he walked up there. A. At the
time he was walking up, well he was walking along, and
I never heard him say anything just then.

"Q. What, if anything, did Mr. Huber do after walking

those few steps? A. After a while he turned around and says: 'Billings, I want that saddle, and I want it right away.'

"Q. At the time he spoke these words in what position was that gun held? A. It was held towards us. Is that what you mean, which way it was pointing?

"Q. No; that was not the purpose of the question. That would have been the next question. I was asking what position the gun was held in by Mr. Huber. A. The stock of the gun was held under his arm down to his side.

"Q. And in what direction was the barrel pointing? A. Pointed towards Mr. Billings and myself.

"Q. Was there any reply made by Mr. Billings after those remarks addressed to him by Mr. Huber? A. Yes, sir.

"Q. What was that reply? A. He pointed over his shoulder and says: 'There is your saddle, Jerry; there is your saddle.'

"Q. Now, at the time Jerry Huber made this request of Mr. Billings, and at the time Mr. Billings made this answer to Jerry Huber, what, if anything was Mr. Billings doing? A. Walking along by the side of me at the time Mr. Huber made the remark, and just passed in front of me as he spoke.

"Q. That is, Mr. Billings passed in front of you as he spoke to Jerry? A. Yes, sir.

"Q. Then what, if anything, did Mr. Billings do next? A. Stepped back to my left side and kept on going towards Mr. Huber.

"Q. Did he walk clear down to where Mr. Huber was? A. He did, within a few feet.

"Q. How fast was he going? A. Well, about a medium gait.

"Q. By a medium gait do you mean a medium-gaited walk, or a medium-gaited run? A. A medium-gaited walk.

"Q. What, if anything, did Jerry Huber, the defendant, do while Mr. Billings was walking towards him? A. Demanded him to stop.

"Q. How far was Mr. Billings from Jerry at the time Jerry demanded that he stop? A. About fifteen steps.

"Q. Did Mr. Billings stop. A. He did not.

"Q. What did he do? A. Kept on going down towards Mr. Huber.

"Q. After that did Jerry do anything while Mr. Billings was walking towards him? A. He told him to stop again.

"Q. How far was Mr. Billings from Jerry when that second request was made? A. About halfway between himself and me.

"Q. Did Mr. Billings then stop? A. He did not.

"Q. On either of these occasions did he make any reply to Jerry? A. He did not.

"Q. What did he do after this second request to stop? A. He kept on going towards Mr. Huber.

"Q. And then what did Jerry do, if anything? A. He did nothing.

"Q. After Jerry had requested him to stop the second time, and when Mr. Billings continued on towards Jerry, what, if anything, occurred? A. When he got within a few feet of him Mr. Huber told him to stop again, and just as he told him to stop he made a lunge for the gun.

"Q. Who made the lunge for the gun? A. Mr. Billings.

"Q. What, if anything, did Jerry do when Mr. Billings made the lunge for the gun? A. He stepped back a couple of short steps.

"Q. Then what, if anything, happened? A. When Mr. Billings made the lunge for the gun he threw his right hand up, and Mr. Huber jerked it to the side slightly, and then drew it back and fired.

"Q. Jerked what to the side? A. Jerked the shotgun at the side slightly.

"Q. How many shots were fired? A. One.

"Q. How do you know that a shot was then fired? A. Because I heard it and saw the blaze.

"Q. Then what, if anything, did Mr. Billings do. A. He dropped."

[4] It now becomes necessary for us to determine if

defendant made an assault upon the deceased; for, if he did not, the rule invoked by the learned trial judge is not applicable. An "assault" is defined by our statute to be:

"An unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Section 6412, Rev. Laws, 1912.)

"An assault is an attempt to offer, with force and violence, to do a corporeal hurt to another." (1 Bac. Abr. 371.)

"An assault is an attempt with force and violence to do a corporeal hurt to another." (Russell on Crimes, 1019.)

"An assault is an attempt to offer, with unlawful force or violence, to do a corporeal hurt to another." (Clark & Mar. on Crimes, 2d ed. sec. 197.)

"An assault is any attempt or offer, with force or violence, to do a corporeal hurt to another, whether from malice or wantonness, with such circumstances as denote, at the time, an intention to do it, coupled with a present ability to carry such intent into effect." (3 Cyc. 1020; see, also, 2 R. C. L. 525.)

"An assault is an intentional attempt to strike within striking distance, which fails of its intended effect, either by preventive interference, or by misadventure." (*Lane* v. *State,* 85 Ala. 12, 4 South. 730.)

"An assault is made by one who in striking distance of another attempts to strike at him or hit him. An assault is an attempt to strike. The battery is the consummated act." (*Com.* v. *Brungess,* 23 Pa. Co. Ct. R. 13, 14.)

"An assault is an apparent attempt, by violence, to do corporeal hurt to another." (Whart. Crim. Law, 11th ed. vol. 2, sec. 797.) "It must also, to adopt the language of the late Judge Gaston, 'amount to an attempt; for a purpose to commit violence, however fully indicated, if not accompanied by an effort to carry it into immediate execution, falls short of an actual assault. * * * It is difficult, in practice, to draw the precise line, which separates violence menaced from violence begun to be

executed; for until the execution of it is begun there can be no assault.' " (Id. sec. 799.)

" 'An assault is an attempt to offer to do another personal violence without actually accomplishing it. A menace is not an assault. * * * Holding a gun in a threatening position, without any attempt to use it, or intention to do so, unless first assaulted by the adversary, is not an assault.' (*Blackwell's Case,* 9 Ala. 79.) Drawing a pistol, without presenting or cocking it, is not an assault, as was decided in *Lawson* v. *State,* 30 Ala. 14." (*Johnson* v. *State,* 35 Ala. 365.)

"To constitute an assault with a gun or pistol, it is necessary that the gun or pistol should be presented at the party charged to be assaulted, within the distance to which the gun or pistol may do execution. Roscoe on Criminal Evidence, top page 286, says: 'There must be an actual presenting of the gun or pistol to make out the assault.' " (*Tarver* v. *State,* 43 Ala. 354.)

"In order to constitute an assault there must be something more than a mere menace. There must be violence begun to be executed." (*People* v. *Yslas,* 27 Cal. 633.)

[5] Since an "attempt" is an essential element in an assault, we must ascertain what constitutes an attempt.

"An act done with intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime." (Rev. Laws, sec. 6291; 12 Cyc. 177; 1 Words and Phrases, p. 622.)

This court, in *State* v. *Lung,* 21 Nev. 209, 28 Pac. 237, 37 Am. St. Rep. 505, said:

"The overt act which constitutes an attempt must be one which manifests an intention to commit the crime."

Let us look at the situation. Defendant got off of his horse, and walking ahead of the horse, held the stock of the gun under his arm, and when he turned in the direction of the deceased and asked him about the saddle the stock of the gun was still under his arm and the barrel pointing in the direction of Billings and the witness. He did not, so far as the evidence shows, ever have his hand on the trigger, and certainly did not single out the deceased and aim the gun at him. The defendant made

no demonstration whatever, so far as we can see, toward making an assault. In the case of *State* v. *Smith,* 10 Nev., it appears on page 116 of the report that the defendant cocked his gun, put it to his shoulder, and advanced upon the deceased. This was clearly an overt act. There was nothing of the kind in this case.

We conclude from the authorities that an assault is more than a mere menace. There may be an intention to commit an assault, there may be preparation, and there may be a menace; but these are not enough. There must be an effort put forth to carry the intention into execution; there must be an overt act. Did the defendant put forth an effort to assault the deceased before he started to walk toward the defendant? Defendant had the loaded gun; nothing interfered to prevent defendant's shooting; there was no misadventure. If defendant, armed as he was, had made an effort to shoot, and there being no interference or misadventure, it is clear that he could have shot. We are of the opinion that the most it can be said the defendant did, prior to the time when deceased made an effort to get the gun, was to menace the deceased. The evidence as to the reputation of the deceased for being of a violent, turbulent, and dangerous disposition should have been admitted.

[6] Error is assigned to the giving by the court of the state's requested instruction No. 38, which reads as follows:

"The jury are instructed: That, while evidence of the general reputation of the defendant in and about the neighborhood in which he lived at or about the time of the commission of the alleged offense is admissible, and is a circumstance to be considered by the jury in connection with all the other facts in the case, the opinion or opinions of individual witnesses as to the character of the defendant are not to be considered for the purpose of proving the existence of or the character of his general reputation; and in this case evidence of the character last mentioned should not be considered by the jury in determining any issue of this case."

This instruction was given for the purpose of reaching

some evidence that was given by the defense, and of laying down the rule that a man's general reputation cannot be established by the opinion of the witness, but by the reputation he bears in the community in which he lives.  It was clearly right.  (16 Cyc. 1275.)

While there are numerous other assignments, we do not deem it necessary, in view of the rulings made, to pass upon them.

It is ordered that the judgment of the lower court be reversed.